# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF NEW YORK

SHONDA R. HANNAH,

           Plaintiff(s),       **REPORT & RECOMMENDATION**

    v.                     08-cv-6567L

ONE COMMUNICATIONS,

           Defendant(s).

## Preliminary Statement

This case arises from *pro se* plaintiff Shonda Hannah's (hereinafter plaintiff or "Hannah") employment with defendant One Communications. Plaintiff filed the instant action pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq.*, alleging that defendant One Communications unlawfully terminated her employment on the basis of her race. See Complaint (Docket # 1). Currently pending before the Court is defendant's motion for summary judgment, wherein defendant seeks to have plaintiff's Complaint dismissed in its entirety. (Docket # 34). By Order of Judge David G. Larimer dated December 6, 2010, the instant motion has been referred to this Court pursuant to 28 U.S.C. § 636(b). (Docket # 38). The following is my Report and Recommendation as to the defendant's motion for summary judgment (Docket # 34).

## Relevant Facts

On July 19, 2004, plaintiff Shonda Hannah was hired by defendant for a permanent position as a "MAC Representative" in the

"MAC Group" which was part of defendant's client services support function.  See Declaration of Jennifer Coles (hereinafter "Coles Decl.") annexed to Docket # 34 at ¶ 3.  As a MAC Representative, plaintiff was responsible for the data entry necessary to initiate changes in services provided to defendant's customers.  See id. MAC Representatives do not frequently have reasons or occasions to use their telephones for business purposes.  Id. at ¶ 4.  Plaintiff was issued an employee handbook from defendant.  Id. at ¶ 8. Defendant's employee handbook states the following company policy with respect to employee telephone use: "It is essential that you keep personal telephone use from interfering with the business use of the Company's telephones.  Although the Company recognizes that you must use the telephone occasionally for important personal matters, such use must be kept to a minimum."  See Exhibit "A" attached to Coles Decl.

During the relevant time period, Jennifer Coles was defendant's Rochester MAC Group Supervisor and, accordingly, was plaintiff's direct supervisor.  See Coles Decl. at ¶ 2.  According to plaintiff, Coles made offensive racist gestures and remarks to her.  See Deposition Transcript of Shonda R. Hannah (hereinafter "Hannah Depo. Tr.") attached as Exhibit "A" to Affidavit of Todd Shinaman[1] at pp. 117, 120-125.  Specifically, plaintiff asserts

---

[1] The Affidavit of Todd Shinaman is annexed to Docket # 34.

that Coles made two racist comments to her.  Plaintiff claims that in response to plaintiff telling Coles that she could not work overtime, Coles asked her: "what if they'll be having fried chicken?"  <u>See</u> Plaintiff's Response in Opposition (hereinafter "Pl.'s Opp.") (Docket # 36).  Plaintiff maintains that on a separate occasion, Coles was singing a song by the African American artist Beyonce and proclaimed "I like your songs too" to plaintiff. <u>Id.</u>  Plaintiff maintains that she complained to MAC Group Manager Sara Cordaro, who was Ms. Coles's supervisor, about the racist comments that Coles had made to her.  <u>Id.</u> at pp. 120-121, 123. According to plaintiff, Ms. Cordaro did not do anything about her complaint.  <u>Id.</u> at p. 120.

On May 4, 2006, during a meeting with the Rochester MAC Group which included plaintiff, Jennifer Coles reviewed the defendant's "Acceptable Use Policy."  <u>See</u> Coles Decl. at ¶ 10.  The Policy instructs that the systems available to defendant's employees – including email, phone and internet – are provided to employees to conduct Company business.  <u>Id.</u>  The Policy provides that an employee's failure to comply with the Policy will result in disciplinary action up to and including termination.  <u>Id.</u>

On June 16, 2006, while assisting plaintiff with a problem she was experiencing with her email account, Coles learned that plaintiff had sent and received a large amount of personal, non-business related emails.  <u>Id.</u> at ¶ 11.  Coles advised plaintiff

3

that she should not be sending and receiving so many personal emails on her work time during the work day.  Id.  On June 26, 2006, Coles conducted a follow-up meeting with plaintiff, during which she discussed the large amount of personal emailing she observed plaintiff engaged in on June 16th and reminded plaintiff of the defendant's Acceptable Use Policy.  Id. at ¶ 12.  Plaintiff indicated to Coles that she understood the Policy.  Id.  On July 11, 2006, Coles had another follow-up meeting with plaintiff, during which plaintiff informed Coles that she no longer sent or received personal emails at work.  Id.  On January 3, 2007, Coles held another meeting with the Rochester MAC Group – which plaintiff attended – and again reviewed the defendant's Acceptable Use Policy.  Id. at ¶ 13.

On August 20, 2007, Coles observed plaintiff accessing the website youtube.com, and also saw her shopping for boots online. Id. at ¶ 14.  On August 21, 2007, Coles had a one-on-one meeting with plaintiff to discuss her improper internet usage and to again remind plaintiff of the defendant's Acceptable Use Policy.  Id. Based on her August 20th observations, Coles requested that copies of plaintiff's sent and received emails be pulled from the system. Id.  Those email records revealed that plaintiff never ceased sending and receiving personal emails during her work time as she had previously indicated to Coles.  Id.  Coles conveyed this information to her supervisor, Sara Cordaro.  Id. at ¶ 15.  She

4

also told Cordaro that various Rochester MAC Group Representatives had made complaints about their co-workers making personal telephone calls and wasting Company time by using the internet for personal use.  Id.; see also Declaration of Sara Cordaro (hereinafter "Cordaro Decl.") annexed to Docket # 34 at ¶ 5.  In an effort to determine the extent of the employees' personal use of the defendant's systems, management decided to compile and review the August 2007 telephone records for four MAC Representatives in the Rochester and Green Bay offices.  Coles Decl. at ¶ 16; Cordaro Decl. at ¶ 6.  Coles reviewed the telephone use logs and identified the employees' personal telephone calls, as well as the amount of time spent on each personal call.  Coles Decl. at ¶ 16; Cordaro Decl. at ¶ 6.  The review was completed in mid-September 2007, upon which Coles presented the results to Cordaro.  Coles Decl. at ¶ 16; Cordaro Decl. at ¶ 6.

The results revealed that for the month of August 2007, plaintiff spent 33.9 hours of her 160 work hours on personal telephone calls.  See Exhibits "E" and "F" attached to Coles Decl. The report indicated that plaintiff spent nearly four times as much time on personal telephone calls than the other employees whose records were reviewed.[2]  See Coles Decl. at ¶ 17; Cordaro Decl. at ¶ 7.  The report further showed that plaintiff placed her personal

_____

[2] The next closest Rochester MAC Representative spent only 8.4 hours on personal telephone calls.  See Coles Decl. at ¶ 17; Cordaro Decl. at ¶ 7.

5

telephone calls throughout her workday, and did not limit her calls to her meal and break times.  <u>See</u> Coles Decl. at ¶ 17.  Ms. Cordaro also reviewed plaintiff's productivity records and noted that the quantity of orders she processed in August 2007 was only 78% of target.  <u>See</u> Cordaro Decl. at ¶ 7.  In prior months, plaintiff consistently reached over 150% of target.  <u>Id.</u>  Defendant's other Rochester employees reached 310%, 195% and 111% of target in August 2007.  <u>Id.</u>

In mid-September 2007, the defendant's Human Resources Department discovered that one of its MAC Group employees – not plaintiff – had a religious quote in his email signature block, which was against Company policy.  <u>See</u> Coles Decl. at ¶ 18.  On September 18, 2007, as a result of this finding, Ms. Coles sent an email to the MAC Group which explained and circulated the defendant's "Email Signature Policy" and requested that employees remove any religious quotes from their email signature blocks.  <u>Id.</u>  In response to Coles's email, plaintiff emailed Coles and asked if the Policy applied to the entire company or just one department.  <u>Id.</u>  Coles responded that it applied to the entire company.  <u>Id.</u>  On September 19, 2007, Ms. Cordaro held a meeting with the MAC Group to clear up any confusion regarding the defendant's Email Signature Policy, during which she confirmed that the Policy applied to all quotes in all employees' email signature blocks.  <u>See</u> Cordaro Decl. at ¶ 8.

On September 21, 2007, Cordaro had a meeting with defendant's Vice President, David Young, during which she presented the results of the telephone usage investigation. Id. at ¶ 9; see also Declaration of David Young (hereinafter "Young Decl.") annexed to Docket # 34 at ¶ 3. Ms. Cordaro also informed Mr. Young that plaintiff's productivity and performance for August 2007 was significantly below target, that the amount of time plaintiff spent on the phone for personal calls was in contravention of Company policy, that Ms. Coles had repeatedly reviewed the Company's Acceptable Use Policy with MAC Group Representatives including plaintiff, and that Ms. Coles had counseled plaintiff in one-on-one meetings with respect to her excessive personal emails and internet use. See Cordaro Decl. at ¶ 9; Young Decl. at ¶ 3. Vice President Young found the amount of plaintiff's personal telephone calls to be "significant" and "unacceptable." Young Decl. at ¶ 3. During the September 21st meeting, Ms. Cordaro recommended to Mr. Young that plaintiff's employment be terminated. Cordaro Decl. at ¶ 9; Young Decl. at ¶ 3. Young agreed with Cordaro's recommendation and approved plaintiff's termination. Young Decl. at ¶ 3. At the time Young approved Cordaro's recommendation to terminate plaintiff's employment, Young had not yet been made aware of the September 19th meeting during which the Company's Email Signature Policy had been reviewed or that plaintiff had challenged the application of the Policy. Id. at ¶ 5.

On September 21, 2007, Cordaro, Coles and a Human Resources representative met with plaintiff and informed her that her employment was terminated.  <u>See</u> Coles Decl. at ¶ 19.  Ms. Coles hired Leon Davis, an African-American, to replace plaintiff after she was terminated.  <u>Id.</u> at ¶ 20.

In her Complaint, plaintiff asserts that although she was terminated for "excessive telephone usage," she was never once warned about her conduct or "written up" for misconduct.  <u>See</u> Complaint (Docket # 1).  According to plaintiff, Caucasian employees are treated differently (better) than African American employees.  Plaintiff asserts that certain Caucasian employees with far worse conduct are still employed by defendant.  Plaintiff maintains that a Caucasian female who she used to work with was "constantly" on personal telephone calls and repeatedly used profane language but was never reprimanded and is still employed by defendant.  <u>Id.</u>

With this lawsuit, plaintiff makes claims of race discrimination and retaliation under Title VII of the Civil Rights Act of 1964 and the New York Executive Law § 296 (the "New York Human Rights Law" or "NYHRL").

## Discussion

<u>Summary Judgment Standard</u>: The general principles used to evaluate the merits of summary judgment motions are well settled. Pursuant to Federal Rule of Civil Procedure 56(a), summary judgment

8

is warranted where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  A genuine issue exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  In deciding a motion for summary judgment, all ambiguities and inferences drawn from the evidence must be viewed in the light most favorable to the party opposing the motion. Tomka v. Seiler Corp., 66 F.3d 1295, 1304 (2d Cir. 1995), *abrogated on other grounds by*, Burlington Indus., Inc. v. Ellerth, 524 U.S. 742, 118 S. Ct. 2257 (1998).  While the burden of showing that no genuine factual dispute exists is on the defendant, when faced with a properly supported summary judgment motion, plaintiff must "come forth with evidence sufficient to allow a reasonable jury to find in her favor." Brown v. Henderson, 257 F.3d 246, 252 (2d Cir. 2001).  "Such an issue is not created by a mere allegation in the pleadings, nor by surmise or conjecture on the part of the litigants." United States v. Potamkin Cadillac Corp., 689 F.2d 379, 381 (2d Cir. 1982)(citations omitted).  Finally, "the mere existence of factual issues – where those issues are not material to the claims before the court – will not suffice to defeat a motion for summary judgment." Quarles v. Gen. Motors Corp., 758 F.2d 839, 840 (2d Cir. 1985)(per curiam).

9

In evaluating the merits of a summary judgment motion in the context of a discrimination claim, courts must be cautious in granting the relief where the conduct at issue "requires an assessment of individuals' motivations and state of mind" because juries have "special advantages over judges in this area." Brown v. Henderson, 257 F.3d at 251.   Nevertheless, "the salutary purposes of summary judgment – avoiding protracted, expensive and harassing trials – apply no less to discrimination cases than to commercial or other areas of litigation." Meiri v. Dacon, 759 F.2d 989, 998 (2d Cir. 1985).  "[S]ummary judgment remains available to reject discrimination claims in cases lacking genuine issues of material fact." Chambers v. TRM Copy Ctrs. Corp., 43 F.3d 29, 40 (2d Cir. 1994).  See Abdu-Brisson v. Delta Air Lines, Inc., 239 F.3d 456, 466 (2d Cir. 2001)("It is now beyond cavil that summary judgment may be appropriate even in the fact-intensive context of discrimination cases.").

Plaintiff's Discrimination Claim: Plaintiff alleges that she was terminated from her employment on the basis of her race.  She alleges that other Caucasian employees were treated differently than her and are still employed by defendant despite their worse conduct.

Plaintiff's Title VII discrimination claims are subject to the burden-shifting framework set forth in McDonnell Douglas Corp. v.

Green, 411 U.S. 792, 802-05 (1973).[3]   Under that framework, the plaintiff bears the initial burden of proving a *prima facie* case by demonstrating the following: (1) she belongs to a protected class, (2) she was qualified for the position held and satisfactorily performed her duties, (3) she suffered an adverse employment action, and (4) this action occurred under circumstances giving rise to an inference of discrimination on the basis of her membership in that class.   If a plaintiff establishes a *prima facie* case of discrimination, the burden of production shifts to the employer to demonstrate a valid reason for the adverse employment action.   Once the defendant employer shows a valid reason for its adverse actions, the inference of discrimination is eliminated, and the burden of production shifts back to the plaintiff to prove "that any seemingly legitimate reason proffered by the employer is, in reality, a pretext for unlawful discrimination."   de la Cruz v. New York City Human Res. Admin. Dep't of Soc. Servs., 82 F.3d 16, 20 (2d Cir. 1996).

For the purposes of the summary judgment motion, the defendant does not contest the first three elements of proving a *prima facie*

---

[3] "New York courts require the same standard of proof for claims brought under the [New York Human Rights Law] as those brought under Title VII."   See Casolare v. Cnty. of Onondaga, No. 5:00-CV-1500 (HGM/GJD), 2006 WL 1877139, at *5 n.5 (N.D.N.Y. July 6, 2006); see also Seils v. Rochester City Sch. Dist., 192 F. Supp. 2d 100, 120 (W.D.N.Y. 2002)(noting that in the Second Circuit, "claims brought under New York State's Human Rights Law are analytically identical to claims brought under Title VII")(quoting Torres v. Pisano, 116 F.3d 625, 629 n.1 (2d Cir. 1997)).

case of discrimination.  Defendant argues, however, that plaintiff has not proven the fourth element – *i.e.*, she cannot show that her termination occurred under circumstances giving rise to an inference of discrimination.  I agree.

It is important to note that other than the allegations regarding the two comments made by Jennifer Coles, plaintiff has not alleged any facts that would indicate racial animus by the defendant.  Assuming *arguendo* that Coles's two comments were evidence of racism, they do not provide an adequate basis for an unlawful termination claim.  Absent other indicia of discrimination,  statements made by an individual who did not make the adverse employment decision at issue will not support a claim of discrimination.  See Dawson v. Bumble & Bumble, 246 F. Supp. 2d 301, 325 (S.D.N.Y. 2003)("Allegedly discriminatory remarks by non-decisionmakers, or by officers with general authority to hire and fire but who played no role in the plaintiff's dismissal, are insufficient to create an issue of disputed fact for trial."); see also Hines v. Hillside Children's Ctr., 73 F. Supp. 2d 308, 316-17 (W.D.N.Y. 1999)(finding that since the comments were made by someone who was not involved in the decision to terminate plaintiff, "her comments are irrelevant on the issue of [plaintiff's] termination").  Specifically, "unless the remarks upon which plaintiff relies were related to the employment decision in question, they cannot be evidence of discriminatory discharge."

McCarthy v. Kemper Life Ins. Cos., 924 F.2d 683, 686 (7th Cir. 1991).   Without a connection between the comments and the discharge, "evidence of a supervisor's occasional or sporadic use of a slur directed at an employee's race" is "not enough to support a claim under Title VII." Coleman v. Prudential Relocation, 975 F. Supp. 234, 243 (W.D.N.Y. 1997)(citations omitted).   See Boyle v. McCann-Erickson, Inc., 949 F. Supp. 1095, 1102 (S.D.N.Y. 1997)(noting that statements made by those not involved in the discharge cannot be the basis of a discrimination claim).

The record before the Court demonstrates that Jennifer Coles was not a decisionmaker as to plaintiff's termination.   Rather, defendant's Vice President, David Young, made the decision to terminate plaintiff based on Group Manager Sara Cordaro's recommendation.   See Young Decl. at ¶ 3; Cordaro Decl. at ¶ 9. Vice President Young made the decision to terminate plaintiff without direction from or the approval of Jennifer Coles.   Nor do the facts behind the termination suggest a racially motivated discharge.   Although plaintiff may have complained to Cordaro about Coles's remarks, defendant has presented strong and uncontradicted evidence supporting the decision to terminate plaintiff.   Plaintiff does not dispute that she made the phone calls at issue.   See Hannah Depo. Tr. at p. 134 ("No.   I'm not disputing making any phone calls here.   That's not the issue here.   I'm not disputing that I did not use the phone.   I said everyone used the phone.").

13

Plaintiff concedes that there is no evidence that the defendant's telephone records are inaccurate. See id. at p. 143. Instead, when asked whether she considered "personal calls in excess of 33 hours in a month" to be excessive, she responded "[n]o, I wouldn't." Id. Plaintiff's justification for her excessive phone calls is that she has four children and placed the calls to "check[] on my kids," and her mother was hospitalized and she made the phone calls "to check on her mother's condition." Id.; see also Pl.'s Opp. Although plaintiff may have reasons for making so many calls, the evidence is clear that plaintiff made what her employer reasonably concluded were excessive personal telephone calls in August 2007 in violation of defendant's Acceptable Use Policy.

In addition, upon plaintiff's termination, Jennifer Coles hired Leon Davis, an African American, to replace plaintiff. See Coles Decl. at ¶ 20. "Where a member of the plaintiff's protected class is contemporaneously hired as a replacement, the offering of proof of intentional discrimination appears extremely difficult, if not practically impossible." Fleming v. MaxMara USA, Inc., 644 F. Supp. 2d 247, 261 (E.D.N.Y. 2009)(quotation mark and citations omitted), aff'd, 371 F. App'x 115 (2010)(noting that plaintiff was unable to establish an inference of discrimination where she was replaced by someone "in her protected class ... by another black female").

In sum, plaintiff has not presented any admissible evidence that the defendant's decision to terminate her employment occurred under circumstances that would give rise to an inference of discrimination based on her race.  With no evidence supporting an inference that plaintiff's termination occurred on account of her race, and in light of plaintiff's immediate replacement by a person of plaintiff's same race, plaintiff has failed to meet her initial burden of establishing a *prima facie* case of race discrimination.

Even if, for argument's sake, plaintiff could prove a *prima facie* case of discrimination, defendant has shown that it had a valid reason to terminate plaintiff's employment, and plaintiff cannot establish that said reason is in reality a pretext for unlawful discrimination.  Defendant has demonstrated that plaintiff violated defendant's Acceptable Use Policy by making an excessive amount of personal telephone calls in August 2007.  The record before the Court shows that plaintiff was aware of the Policy, was counseled by Jennifer Coles on the Policy, yet continued to violate the Policy.  Plaintiff has failed to raise a genuine issue of fact as to pretext.  In support of a claim that plaintiff's phone usage was a pretext for her termination, plaintiff alleges that Caucasian employees were treated differently.  Specifically, she claims that a Caucasian co-worker Mary Beth Babcock also made personal telephone calls at work and used profane language but was not

terminated by defendant.[4]   During her deposition, however, plaintiff admitted that Mary Beth Babcock was not similarly situated, as Babcock worked in a different department and her job – contrary to plaintiff's job – actually *required* her to be on the telephone.   <u>See</u> Hannah Depo. Tr. at pp. 106-07.   Again, the evidence shows that plaintiff made personal telephone calls far more than any of the other employees at One Communications whose telephone records were reviewed.  Accordingly, the Court finds that plaintiff's termination on grounds of her excessive personal telephone usage was not pretextual.

Though not articulated clearly, *pro se* plaintiff also appears to be alleging a hostile work environment claim.   Construing the facts in plaintiff's favor, however, she has failed to establish that the conduct she complains of approaches the level of a hostile work environment for Title VII purposes.  To succeed on a claim for hostile work environment, a plaintiff must show that she: (1) is a member of a protected class; (2) suffered unwelcome harassment; (3) was harassed because of her membership in a protected class; and (4) the harassment was sufficiently severe or pervasive to alter conditions of her employment and create an abusive work environment.   <u>Carmody v. City of N.Y.</u>, No. 05 Civ. 8084(HB), 2006

---

[4] During her deposition, plaintiff testified: "Mary Beth was on her phone, loud and obnoxious, swearing on the floor... She still have her job.  We have the same manager at the time.  That's why I feel it was discrimination."  <u>See</u> Hannah Depo. Tr. at p. 106.

16

WL 3317026, at *14 (S.D.N.Y. Nov. 13, 2006)(citing Meritor Sav. Bank, FSB v. Vinson, 477 U.S. 57, 65 (1986)). "In order to survive summary judgment on a claim of hostile work environment harassment, a plaintiff must produce evidence that the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment." Cruz v. Coach Stores, Inc., 202 F.3d 560, 570 (2d Cir. 2000)(citations and quotations omitted). "As a general rule, incidents must be more than episodic; they must be sufficiently continuous and concerted in order to be deemed pervasive." Alfano v. Costello, 294 F.3d 365, 374 (2d Cir. 2002)(citation and quotations omitted).

Upon consideration of the totality of the circumstances here, the Court finds that the conduct plaintiff complains of is not severe or pervasive enough to create an objectively hostile or abusive work environment. In making this determination, the Court has considered the following factors: "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employees work performance." See Harris v. Forklift Sys., Inc., 510 U.S. 17, 23 (1993). Here, the record before the Court reveals that the discriminatory conduct was infrequent, as plaintiff has pointed to only two allegedly racist comments made by her supervisor Jennifer

Coles.  "Isolated incidents of offensive conduct are generally inadequate to establish a hostile work environment claim." Fleming, 644 F. Supp. 2d at 262.  While plaintiff found the comments to be racially derogatory, the comments were not physically threatening and there is nothing in the record suggesting that plaintiff's work environment was dominated by racial slurs or racially insensitive comments.  There is also no evidence that the two comments by Coles unreasonably interfered with the plaintiff's work performance.  Certainly even sporadic racially offensive or insensitive utterances can be hurtful, but the issue here is whether they rise to the level of being actionable.  It is well settled that Title VII is not intended to act as a "general civility code" and that sporadic objectionable or inappropriate comments and behavior simply will not rise to the extreme level of behavior necessary to prove a hostile work environment.  Petrosino v. Bell Atl., 385 F.3d 210, 223 (2d Cir. 2004); see also Faragher v. City of Boca Raton, 524 U.S. 775, 788 (1998)("simple teasing" or "offhand comments, and isolated incidents [unless extremely serious] will not amount to discriminatory changes in the 'terms and conditions of employment'"); Quinn v. Green Tree Credit Corp., 159 F.3d 759, 768 (2d Cir. 1998)("As a general matter, isolated remarks or occasional episodes of harassment will not merit relief under Title VII; in order to be actionable, the incidents of harassment must occur in

18

concert or with a regularity that can reasonably be termed pervasive.")(quotation mark and citations omitted), *abrogated on other grounds by*, National R.R. Pass. Corp. v. Morgan, 536 U.S. 101 (2002); Bain v. Wal-Mart Stores, Inc., 585 F. Supp. 2d 449, 454 (W.D.N.Y. 2008)("Title VII is not a general civility code, and a few isolated incidents of boorish or offensive use of language are generally insufficient to establish a hostile work environment.")(quotation marks and citations omitted).

In sum, the Court finds that viewed in the light most favorable to plaintiff, the evidence here is insufficient to demonstrate that the incidents plaintiff charges as racial harassment constitute violations of Title VII. The Court is not persuaded that a reasonable jury could find that objectively the incidents plaintiff complains of were so severe or pervasive to create a hostile or abusive work environment actionable under Title VII. Accordingly, the Court holds that plaintiff's claims of racial discrimination and racial harassment must be dismissed.

2. Plaintiff's Retaliation Claim: Title VII prohibits an employer from "discriminat[ing] against any of his employees ... because [the employee] has opposed any practice made an unlawful employment practice by" Title VII. See 42 U.S.C. § 2000e-3(a). Plaintiff alleges that she was terminated in retaliation for complaining to Sara Cordaro, Manager of the MAC Group, about the defendant's Email Signature Policy.

19

Like with claims of discrimination, a claim of retaliation is subject to the burden-shifting analysis used in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). See Reed v. A.W. Lawrence & Co., 95 F.3d 1170, 1178 (2d Cir. 1996)(applying McDonnell Douglas analysis to retaliation claims). "Title VII is violated when an employer is motivated by retaliatory animus, even if valid objective reasons for the discharge exist." Cosgrove v. Sears, Roebuck & Co., 9 F.3d 1033, 1039 (2d Cir. 1993)

Under the McDonnell Douglas analysis, the plaintiff must establish a *prima facie* case of retaliation, which the defendant must rebut with a legitimate reason for the action. Then the plaintiff carries the ultimate burden of showing that the proffered explanation is really a pretext for retaliation. To establish a *prima facie* case of retaliation, the plaintiff must establish: (1) that she was engaged in a protected activity of which the employer was aware; (2) that she was discharged or otherwise adversely affected; and (3) that there is a causal connection between the two. Quinn v. Green Tree Credit Corp., 159 F.3d 759, 769 (2d Cir. 1998)(citation omitted), *abrogated on other grounds by*, National R.R. Pass. Corp. v. Morgan, 536 U.S. 101 (2002). Proof of the causal connection can be established by showing that the protected activity was closely followed in time by the adverse action. Manoharan v. Columbia Univ. Coll. of Physicians & Surgeons, 842 F.2d 590, 593 (2d Cir. 1988).

20

Here, plaintiff cannot sustain the initial burden of proving a *prima facie* case. Though not entirely clear, it appears that plaintiff is asserting that her termination was in retaliation for her challenging the defendant's Email Signature Policy during a MAC Group meeting with Group Manager Cordaro. Plaintiff asserts that she "was terminated and retaliation played a huge part" because her termination came only two days after she challenged the Policy, which, *inter alia*, prohibits employees from having religious quotes in their email signature blocks.

I find that plaintiff's challenge or complaint to Cordaro about the Email Signature Policy did not constitute "protected activity." Protected activity has been defined as that which opposes unlawful employment practices under Title VII. See 42 U.S.C. § 2000e-3(a). Protesting the email policy was not a protected activity.

> In order for an employee's complaints to be a 'protected activity' they must relate to an alleged violation of Title VII, i.e., the complaints must relate to race or gender. Otherwise, any employee who is disgruntled or dissatisfied with any aspect of his or her employment would ultimately find relief in Title VII even when race or gender was not an issue.

Bain v. Wal-Mart Stores, Inc., 585 F. Supp. 2d 449, 453 (W.D.N.Y. 2008)(citations omitted). Accord Cruz. v. Coach Stores Inc., 202 F.3d 560, 566 (2d Cir. 2000)(protected activity for Title VII retaliation claims "refers to action taken to protest or oppose statutorily prohibited discrimination"). Here, plaintiff's

complaint with respect to the Email Signature Policy did not involve race or gender. Moreover, there is no suggestion that, in complaining about the Email Signature Policy, plaintiff had a good faith reasonable belief that her employer was violating Title VII. Accordingly, I find that plaintiff has not established that she engaged in a "protected activity" when she challenged the Email Signature Policy. See Bilingslea v. Ford Motor Co., No. 06-CV-0556, 2010 WL 4861500, at *10 (W.D.N.Y. Nov. 30, 2010)("In order for [plaintiff's] complaint to be considered a 'protected activity' it must relate to race or gender.").

Even assuming, *arguendo*, that plaintiff engaged in protected activity when she challenged the Email Signature Policy, plaintiff has not produced sufficient evidence to suggest a causal connection between the protected activity and the adverse action. Vice President Young, who approved plaintiff's termination, was the decision-maker with respect to plaintiff's termination and he was unaware that plaintiff had challenged the Email Signature Policy. See Young Decl. at ¶ 5. Young chose to terminate plaintiff based on the results of the phone usage investigation, as well as the report that plaintiff's productivity for August 2007 was significantly below target, and that plaintiff had been repeatedly advised regarding acceptable phone and internet usage yet she continued to use the phone and internet excessively for personal matters. Id. at ¶ 3. Thus, plaintiff can not demonstrate that a

causal connection exists between her complaints regarding the Email Signature Policy and her termination.  Indeed, the evidence in the record overwhelmingly supports the defendant's proffered non-discriminatory reasons for plaintiff's termination.  That plaintiff's termination occurred shortly after plaintiff complained about the Email Signature Policy is not, on this record and standing alone, sufficient to defeat summary judgment.  See Monroe v. Xerox Corp., 664 F. Supp. 2d 235, 246-47 (W.D.N.Y. 2009)(temporal proximity between protected activity and an adverse employment action is insufficient by itself to create a triable issue of fact).  Accordingly, plaintiff cannot establish a *prima facie* case of retaliation and her claims for retaliation should be dismissed.

## Conclusion

For the reasons set forth herein, it is my Report and Recommendation that defendant's motion for summary judgment (Docket # 34) be **granted** and plaintiff's Complaint be dismissed.

**SO ORDERED.**

_____
JONATHAN W. FELDMAN
United States Magistrate Judge

Dated: September 28, 2011
Rochester, New York

23

Pursuant to 28 U.S.C. § 636(b)(1), it is hereby

**ORDERED**, that this Report and Recommendation be filed with the Clerk of the Court.

**ANY OBJECTIONS** to this Report and Recommendation must be filed with the Clerk of this Court within fourteen (14) days after receipt of a copy of this Report and Recommendation in accordance with the above statute, Fed. R. Civ. P. 72(b) and Local Rule 72.3(a)(3).

The district court will ordinarily refuse to consider on *de novo* review arguments, case law and/or evidentiary material which could have been, but was not, presented to the magistrate judge in the first instance. *See, e.g., Patterson-Leitch Co., Inc. v. Mass. Mun. Wholesale Elec. Co.*, 840 F.2d 985 (1st Cir. 1988).

**Failure to file objections within the specified time or to request an extension of such time waives the right to appeal the District Court's Order.** *Thomas v. Arn*, 474 U.S. 140 (1985); *Wesolek v. Canadair Ltd.,* et al., 838 F.2d 55 (2d Cir. 1988).

The parties are reminded that, pursuant to Rule 72.3(a)(3) of the Local Rules for the Western District of New York, "written objections shall specifically identify the portions of the proposed findings and recommendations to which objection is made and the basis for such objection and shall be supported by legal authority." **Failure to comply with the provisions of Local Rule 72.3(a)(3), or with the similar provisions of Local Rule 72.3(a)(2) (concerning objections to a Magistrate Judge's Decision and Order), may result in the District Court's refusal to consider the objection.**

Let the Clerk send a copy of this Order and a copy of the Report and Recommendation to the attorneys for the Plaintiff and the Defendant.

**SO ORDERED.**

_____
Jonathan W. Feldman
United States Magistrate Judge

Dated: September 28, 2011
Rochester, New York